IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MELISSA LUONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:25-cv-01351 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| VANDERBILT UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court is a "Motion for Temporary Restraining Order & Preliminary Injunction" (Doc. No. 18, "Motion"), filed by Plaintiff, Melissa Luong. Via the Motion, Plaintiff moves "pursuant to Federal Rule of Civil Procedure 65 for entry of an Order granting Plaintiff a temporary restraining order ("TRO") and preliminary injunction requiring Defendant to reassign a faculty member to serve as her major advisor ("advisor") and reinstate her into the [Community Research & Action] Program in good standing for the spring 2026 semester beginning January 5, 2026." (*Id.* at 1).[1] Accompanying the Motion is a proposed order (Doc. No. 18-1, "Proposed

---

[1] As noted, Plaintiff moves the Court for a TRO (as well as for a preliminary injunction), "pursuant to Federal Rule of Civil Procedure 65." (Doc. No. 18 at 1). Notably, however, where Fed. R. Civ. P. 65 refers to TROs, it refers only to TROs issued "without written or oral notice to the adverse party," Fed. R. Civ. P. 65(b)(1), which the Court in this footnote will call an "*ex parte*" TRO (since "*ex parte*" means "on one side only; by or for one party; done for, in behalf of, or on the application of one party only." Black's Law Dict. (6th ed. 1990) p. 76.). Rule 65 prescribes rules for the issuance and duration of an *ex parte* TRO. It does not mention, let alone set any rules for, TROs that are not *ex parte*; to the extent that temporary injunctive relief that is not issued *ex parte* is properly called a TRO, such a TRO is simply not within the scope of Rule 65.

Here, Plaintiff has provided Defendant a "[n]otice and a copy of [the Motion]" through the "Court's electronic filing system." (Doc. No. 18 at 2). In theory, this would mean that Plaintiff's Motion is not an *ex parte* motion for a TRO and thus not a motion for a TRO that is within the scope of Rule 65. Nevertheless, the Court will treat Plaintiff's Motion as properly brought under Fed. R. Civ. P. 65, for two reasons. First, although the Court need not delve herein into why this is the case, parties and courts have been known to

Order"), and a memorandum in support of the Motion (Doc. No. 19, "Memorandum"). Filed with the Memorandum are twenty-three exhibits (Doc. Nos. 19-1 – 19-23).

For the reasons described below, the Motion will be **DENIED** in its entirety.

<u>ASSERTED FACTS</u>[2]

This case arises out of a dispute concerning Plaintiff's academic standing in the Community Research & Action ("CRA") Program at Vanderbilt University, Plaintiff's academic advisor (or lack thereof), and certain accommodations that Plaintiff may be entitled to because of her disability. Below, the Court will first address the identities of the parties to this action, before then addressing the factual background underlying this action, the claims Plaintiff brings via her complaint (Doc. No. 1, "Complaint"), and the relief sought via the Motion.

1. <u>Parties</u>[3]

Plaintiff is a student "enrolled in Vanderbilt's Ph.D. CRA Program in the Department of Human and Organizational Development." (Doc. No. 19 at 1; Doc. No. 19-1 at ¶ 1). Plaintiff's

---

speak as if a motion can be one for a TRO within the scope of Rule 65 (and not a preliminary injunction, which is governed by other provisions of Rule 65) even if it is made *with* notice to the opposing party. *E.g., In re Reynolds*, No. 23-22086, 2023 WL 11853230, at *3 (Bankr. W.D. Tenn. Sept. 1, 2023) (A temporary restraining order is a temporary order entered in an action, *often* without notice . . . ."). And second, although Defendant may have been put on notice of the motion through the Court's electronic filing system, the Court's decision here comes before Defendant has responded to the Motion and before the Defendant would necessarily have had a full opportunity to respond to the Motion.

Accordingly, the Court will continue its analysis as if Plaintiff's Motion is properly brought under Fed. R. Civ. P. 65.

[2] The following asserted facts, unless somehow qualified herein (as for example by "Plaintiff alleges that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are *either:* (1) (a) evidentially supported  at least to some degree by Plaintiff; and (b) plausible; *or* (2) subject to judicial notice.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

academic advisor is (or, as will be discussed below, *was*) Dr. Ashmeet Oberoi ("Oberoi"). (Doc. No. 19-1 at ¶ 13).

Defendant (hereinafter, "Defendant," "Vanderbilt" or "Vanderbilt University") "is a private university that receives federal financial assistance within the meaning of Section 504," (Doc. No. 1 at ¶ 5), of the Americans with Disabilities Act ("ADA"), and "operates places of public accommodation within the meaning of Title III of the ADA." (*Id.* at ¶ 6).[4]

2. Factual Background

Before the 2024-2025 school year, Plaintiff achieved a 4.0 GPA in the CRA Program, a Ph.D. program in the Department of Human and Organizational Development ("HOD") at Vanderbilt University, received "positive evaluation reports at the end of her first and second years in the program, and receiv[ed] positive evaluations for her teaching assistant [ ] responsibilities." (Doc. No. 19 at 1; Doc. No. 19-1 at ¶¶ 1, 3-10; Doc. No. 19-2; Doc. No. 19-3). During the 2024-2025 school year, Plaintiff was diagnosed with "mental health impairments [that] caused substantial impairments in [her] ability to think concentrate, and sleep, and substantial impairments to [her] gastrointestinal functions." (Doc. No. 19-1 at ¶ 11; Doc. No. 19-5). The circumstances surrounding Plaintiff's mental health were "communicated" to Oberoi when Plaintiff had to "cancel some meetings with [ ] Oberoi" because of ongoing problems with Plaintiff's health. (Doc. No. 19-1 at ¶ 13). At first, Oberoi "did not communicate [to Plaintiff] any concerns" regarding Plaintiff's decision to cancel certain meetings. (Doc. No. 19-1 at ¶ 14). However, in December

---

[4] The upshot of these allegations is the legal conclusion that, as Plaintiff puts it in her Memorandum, "Defendant is an entity "subject to Section 504 and Title III of the ADA." (Doc. No. 19 at 1) (citing Vanderbilt University, Grievances, https://www.vanderbilt.edu/student-access/grievances/). The Court accepts that legal conclusion, and indeed takes judicial notice that in the just-cited web page, Vanderbilt impliedly recognizes that it is subject to Section 504 of the ADA.

2024,[5] Oberoi communicated to Plaintiff via email "her frustrations and perceived disrespect with meeting cancellations without acknowledging . . . previous communications" with Plaintiff. (Doc. No. 19-1 at ¶ 15). This response helped lead to "mental health diagnoses of major depression, anxiety disorder, and post-traumatic stress disorder in January of 2025" for Plaintiff. (Doc. No. 19 at 2; Doc. No. 19-1 at ¶ 18; Doc. No. 19-5).

Subsequently, and recognizing her "need [ ] [for] support," Plaintiff "sought out [what Plaintiff describes as] reasonable accommodations through the Student Access Office (SAO)," (Doc. No. 19-1 at ¶¶ 19, 20), "related to the expectations and deadlines set by [Plaintiff's] major advisor . . . in an attempt to mitigate [Plaintiff's] disabilities and allow [Plaintiff] to continue to make progress towards her research requirements in the CRA Program." (Doc. No. 19 at 2; Doc. No. 19-5).[6] Plaintiff and representatives of the SAO met on February 6, 2025. (Doc. No. 19-6).[7] The SAO "recognized [Plaintiff's] disabilities," but determined that "[the SAO] could not provide specific accommodations related to advising relationship expectations and such requests should be discussed with an advisor with the help of the HOD department and/or with the Graduate and

[5] Docket No. 19-1 actually refers by its text to Oberoi expressing concerns in "December 2025." (Doc. No. 19-1 at ¶ 15). However, the Court understands that this is a scrivener's error and that this is meant to be a reference to December 2024, as the Motion and Memorandum were both filed in November 2025.

[6] It is not exactly clear what the accommodations were that Plaintiff requested from the SAO. The Complaint characterizes these requested accommodations as "flexibility in scheduling meetings and making up missed time, including research tasks and research meetings," (Doc. No. 1 at ¶ 33), as requested in a letter from Plaintiff's psychotherapist. A letter from Plaintiff's psychotherapist, Sellers Terrell (Docket No. 19-5) is cited in the Memorandum. In that letter, dated January 21, 2025, Terrell, "clinically approv[ed]" Plaintiff's request for what Terrell characterizes as reasonable accommodations, including: "flexibility in scheduling meetings and making up missed time including work and appointments, more emphasis on positive feedback during progress reviews, and increased communication amongst supervisory relationships." (Id.). The Court will thus proceed with the understanding that the accommodations requested by Plaintiff from the SAO are those detailed in Terrell's letter.

[7] Although the reference in the Memorandum to meeting with "the SAO" (an *office*) is imprecise, the Court infers that the reference is, more precisely, to  meeting with one or more SAO representatives (*individuals*).

Postdoc Academic success program ("GPAS")." (Doc. No. 19-1 at ¶ 21). Ultimately, the SAO approved an accommodation consisting of "Notetaking Support." (Doc. No. 19-7).

"Plaintiff continued with efforts to obtain [what Plaintiff describes as] a reasonable accommodation for her advisor's expectations related to research deadlines by consulting with the HOD department chair, the Director of Graduate Studies, and GPAS personnel." (Doc. No. 19 at 3; Doc. No. 19-1 at ¶¶ 23-28, 31-33; Doc. No. 19-8, Doc. No. 19-9). Via email, Plaintiff communicated to Dr. Nichole Allen ("Allen"), who was the HOD Department Chair, and Dr. Brian Christens ("Christens"), who was a professor in the HOD department, that she was concerned about her thesis progress under Oberoi's mentorship, (Doc. No. 19-8 at 2), and requested accommodations including that she be permitted to "switch advisors," "be excused from having a POS committee meeting,"[8] and for Allen and Christens to "help resolve [Plaintiff's] advising situation." (*Id.* at 1).

Ultimately, Plaintiff did not receive "assistance in identifying a new advisor or approval of other . . . accommodations to navigate the issues with [her] current advisor [(Oberoi)] from the CRA faculty or Vanderbilt's SAO." (Doc. No. 19-1 at ¶ 33). Subsequently, Plaintiff "developed additional medical conditions during the spring of 2025 . . . and provided notification of the new

---

[8] The POS committee is the "Program of Studies committee" that consists of "of a minimum of three people: the major advisor (who is a core faculty member) and two additional Graduate Faculty members, at least one of whom must be core CRA faculty." (Doc. No. 1-1 at 3). As provided for in the CRA Handbook: "Students should establish their Program of Studies committee by mid-March of their first year in the program. Students are encouraged to meet with their full committee at least annually, but perhaps more often. In addition to approving students' program of studies, the members of the committee can be a key source of mentoring and support throughout the program and may form the core of degree committees. Students should consult with their advisors for selecting committee members and determining how best to utilize the committee's time and expertise. Students may change POS committee membership as the need arises, in consultation with their advisor." (*Id.*).

medical conditions to her department faculty via the University's 'Dean's Notification.'"[9] (Doc. No. 19 at 3; Doc. No. 19-1 at ¶¶ 29-30; Doc. No. 19-10; Doc. No. 19-11).

Plaintiff was ultimately dismissed from the CRA Program on July 24, 2025, (Doc. No. 19-12; Doc. No. 19-1 at ¶ 34), for failure (according to Vanderbilt) to find a "new advisor" and inadequate "progress towards the PhD degree," including with respect to progress on Plaintiff's thesis. (Doc. No. 19-12; Doc. No. 19 at 3-4). As a consequence of this dismissal, Plaintiff would not be permitted to attain a Ph.D degree through the CRA Program, although she would be permitted to attain a master's degree, (Doc. No. 19-12), without any mention "of dismissal" on Plaintiff's transcript. (Doc. No. 1-4 at 3). "This dismissal occurred despite the fact that Plaintiff never received a poor evaluation, called a Professional Performance Review ("PPR"); was never put on probation; and was never provided written notice of the specific actions she needed to take (and deadline to take such actions) to remedy any concerns as required [according to Plaintiff] by Vanderbilt's policies and student handbook." (Doc. No. 19 at 3; Doc. No. 19-1 at ¶ 36). Likewise, Plaintiff "did not receive assistance with identifying a new advisor" and believed, at the time of her dismissal, that she still had Oberoi as her advisor. (Doc. No. 19-1 at ¶¶ 35, 37).[10]

"Plaintiff appealed the unwarranted dismissal pursuant to Vanderbilt's internal appeals process." (Doc. No. 19 at 5; Doc. No. 19-14; Doc. No. 19-15; Doc. No. 19-16; Doc. No. 1-4; Doc. No. 19-17). Plaintiff's first two appeals (made on July 29, 2025 (Doc. No. 19-14) and on August 28, 2025 (Doc. No. 19-15), respectively) were denied, but a third appeal was granted on October

---

[9] The Dean's Notification appears to be a mechanism to provide notice of student "health issues and pending medical procedure[s]" to Vanderbilt faculty and staff. (Doc. No. 1 at ¶ 40).

[10] It is unclear to the Court at this juncture whether this belief was reasonable. The record indicates that Plaintiff's last meeting with Oberoi was "nine months" before Plaintiff's dismissal and that Vanderbilt understood that Plaintiff's "advising relationship with Oberoi was no longer functional." (Doc. No. 1-4 at 1). Ultimately, the record indicates that Oberoi was removed as Plaintiff's advisor in late May 2025 (though it is unclear whether Plaintiff knew this at the time). (Doc. No. 19-21).

15, 2025 via a letter from Andrea Page-McCaw, Associate Dean of Academic Affairs (Doc. No. 1-4 at 2, "Third Appeal Response"). The Third Appeal Response stated that the CRA Program "failed to notify [Plaintiff] of a deadline for finding a new advisor . . . [and] did not follow its published policies nor the Graduate School's policies in notifying [Plaintiff] of [her] failure to meet expectations about progress to the PhD." (Doc. No. 1-4 at 2). Ultimately, the Third Appeal Response conditioned Plaintiff's reinstatement into the CRA Program on Plaintiff's ability to establish a new advisory relationship by December 5, 2025, but noted that it was "not possible" for the "school [to] assign a new advisor" to Plaintiff "because of the nature of the advising relationship, which takes conversation and reflection by both parties involved to determine fit." (Doc. No. 1-4 at 2). The Third Appeal Response further noted that Plaintiff's "experience in twice choosing to discontinue working with [her] advisor [i.e., previously discontinuing an advisory relationship with two advisors] is evidence of the importance of [the advisory] relationship and the agency that is provided to both parties in assessing whether [such relationship] continues to be productive." (*Id.*).

Ultimately, Plaintiff filed a "fourth appeal to Vanderbilt (currently pending), [that] challenges Vanderbilt's false assertion that [Plaintiff's] dismissal was 'justified' due to failure to meet program expectations, even though it was overturned due to Vanderbilt's failure to follow its procedures." (Doc. No. 19 at 5-6; Doc. No. 19-17). Additionally, on "September 3, 2025" Plaintiff requested, through her attorney, "copies of [Plaintiff's] educational records from Vanderbilt," which "[a]s of October 22, 2025," she had still not received. (Doc. No. 19-1 at ¶¶ 38-39).

3. Plaintiff's Claims

Plaintiff initiated this action on November 20, 2025 by filing the Complaint (Doc. No. 1). Via the Complaint, Plaintiff brings three claims.

First, through Count I, Plaintiff brings a claim for "Disability Discrimination In Violation of Section 504 of the Rehabilitation Act and Title III of the ADA." (Doc. No. 1 at 15). Via Count I, Plaintiff alleges that Defendant failed "to provide reasonable accommodations after Plaintiff requested them," and thereby "excluded [Plaintiff] from, denied her the benefits of, and subjected her to discrimination in its educational programs and activities on the basis of her disability." (*Id.* at ¶ 99). Plaintiff further alleges that Defendant "acted with deliberate indifference by disregarding Plaintiff['s] disability related needs, refusing to provide her with reasonable accommodations, discouraging faculty from serving as her advisor, dismissing her without following Vanderbilt's clearly delineated process for dismissal, falsifying the reasons for her dismissal, removing her existing major advisor, dismissing her from the CRA [P]rogram because of her disability, and engaging in other discriminatory acts and omissions," and that "[b]y refusing to assign Plaintiff an advisor after her dismissal was overturned, [Defendant] further discriminated against [Plaintiff] on the basis of disability and denied her equal access to and participation in the CRA Program." (*Id.* at ¶¶ 100-01).

Second, through Count II, Plaintiff brings a claim for "Retaliation Under the Americans With Disabilities Act." (*Id.* at 16). Via Count II Plaintiff alleges that "[o]n or about January 2025 and ongoing thereafter, Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodations for her disability" and that "Plaintiff further engaged in protected activity when she appealed her dismissal on the basis of discriminatory treatment related to her disability and involved an attorney to advocate for her rights." (*Id.* at ¶ 106). Further, Plaintiff alleges that in retaliation for this protected activity, Defendant took numerous adverse actions against Plaintiff including: "Removing Plaintiff's current advisor, [ ] Oberoi, and then discouraging faculty members from agreeing to serve as Plaintiff's advisor; dismissing [Plaintiff]

from the CRA [P]rogram without following Vanderbilt's clearly delineated policies and procedures; conditioning [Plaintiff's] reinstatement to the CRA Program upon her securing a new advisor; delaying and obstructing [Plaintiff's] access to her educational records; and withdrawing [Defendant's] offer to provide Plaintiff with a master's degree if she is reinstated to the CRA Program." (*Id.* at ¶ 107).

Finally, through Count III, Plaintiff brings a "Breach of Contract" claim. (*Id.* at 18). Via Count III, Plaintiff alleges that she and Defendant "entered into a valid and enforceable contract at the time of Plaintiff's admittance into Defendant's CRA Program at Vanderbilt University," and that "[t]he terms of the contract are specifically delineated in the student handbook, CRA and Graduate Studies written guidelines and procedures, and any other related written promises and agreements, which govern the expectations of academic performance, procedures for probation and dismissal, and the rights of students, including the right to reasonable accommodations and feedback on academic progress." (*Id.* at ¶ 113). Plaintiff alleges that Defendant "breached the contract by failing to perform its obligations under the terms set forth in the student handbook and related academic agreements, including but not limited to: failing to provide Plaintiff with timely and specific feedback regarding any concerns with her academic performance and providing an action plan to correct such concerns, as required by the student handbook and other written documents; and failing to adhere to the probation and dismissal procedures outlined in the student handbook, instead proceeding to dismiss Plaintiff from the CRA Program without following the prescribed procedures for probation and an opportunity to show improvement." (*Id.* at ¶ 114).

4. Relief Sought Via the Motion

Via the Motion, Plaintiff seeks (as shown by the Proposed Order) an order restraining Defendant from "(a) dismissing [Plaintiff] from Vanderbilt University's Ph.D. [CRA Program]

based on the current disputes and (b) from retaliating against [Plaintiff] in any manner for requesting accommodations, appealing her dismissal, or pursuing this litigation." (Doc. No. 18-1 at ¶ 2). Plaintiff also seeks to have the Court, via the Proposed Order, (a) "[reinstate her] into the CRA Program in good standing, with all rights, privileges, and benefits associated with her enrollment; (b) reinstate [Plaintiff's] full support, including a stipend and eighteen hours of tuition through the first five years of the CRA Program, as provided to all CRA Program students and as outlined in the CRA Program Student Handbook, as well as [Plaintiff's] Provost's Graduate Fellowship; (c) permit [Plaintiff] to register for and fully participate in courses and other graduation requirements for the CRA Program beginning on January 5, 2026; (d) assign [Plaintiff] a qualified major advisor to advise her towards her thesis and research requirements; and (e) issue written notice to all the CRA Program faculty and staff indicating that [Plaintiff's] dismissal was unwarranted based on Vanderbilt's own dismissal policies and procedures and that [Plaintiff] is being reinstated in good standing." (*Id.* at ¶ 3).

Plaintiff further requests that the Court, via the requested order, order "Defendant to provide Plaintiff with a copy of her educational records, which were requested by Plaintiff in September of 2025." (*Id.* at ¶ 4).

Finally, Plaintiff requests that the Court, via the requested order, set a briefing schedule for the Motion and set a hearing date as necessary on the Motion. (*Id.* at ¶¶ 6, 7). Presumably in this last request, Plaintiff is referring to a briefing schedule on Plaintiff's request for a preliminary injunction, into which Plaintiff's requested TRO would be converted so that Plaintiff's requested injunctive relief would "remain in effect during the pendency of this action." (Doc. No. 19 at 15).

<u>LEGAL STANDARD</u>

"An ex parte TRO is an extraordinary and drastic remedy . . . ." *Ahrouch v. Boulakhrif*, No. 2:25-CV-02535-SHL-CGC, 2025 WL 1490494, at *2 (W.D. Tenn. May 23, 2025) (quoting *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). Those seeking a TRO (or, for that matter, a preliminary injunction)[11] must meet four requirements.[12]  They must

---

[11] As noted above, via the Motion Plaintiff requests both a TRO and a preliminary injunction. The standards for both a TRO and a preliminary injunction are the same. *G.S. ex rel. Schwaigert v. Lee*, 558 F. Supp. 3d 601, 607 (W.D. Tenn. 2021). Thus herein, the Court considers concurrently Plaintiff's request for a TRO and Plaintiff's request for a preliminary injunction. For the sake of brevity however, throughout the Court's analysis, the Court will, at times, refer to the standard as it relates to a TRO only. The Court notes that for administrative and logistical reasons, it is treating *both* requests in the Motion (the one for a TRO and the one for a preliminary injunction) as denied at this time. *But Plaintiff may move in the future for a preliminary injunction based on additional evidence beyond that presented in connection with the instant Motion.* If such a motion eventually is filed, then absent a court order to the contrary, Defendant's response shall be due two weeks after such filing and Plaintiff's reply shall be due one week after the filing of Defendant's response, and the Court will notify the parties if an evidentiary hearing is to be held.

[12] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g., id.* at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter*.").

 Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g., Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003); *Southern Poverty Law Ctr. v. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020);   *Transatlantic, LLC v. Humana, Inc.*, 8:13–CV– 1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

 The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

 First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is

show a likelihood of success on the merits; irreparable harm in the absence of the injunction; the balance of equities favors them; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022).

Plaintiffs seeking a TRO may not merely rely on unsupported allegations but rather must come forward with more than "scant evidence" to substantiate their allegations.[13] *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915,

---

simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it is easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

The Court notes that herein it quotes some case law that refers to these items as "factors" and describes them in language that befits factors more than requirements—as for example by referring to the *issue* of *whether* issuing the injunction would harm others (factor-style language) rather than the *requirement* that the balance of equities favors the movant, or the issue of where the public interest lies (factor-style language) rather than the requirement that the public interest favors an injunction. In so doing, the Court is confident that the astute reader readily will be able to translate the factor-style language into the corresponding language of requirements for purposes of following the Court's analysis herein. The Court also notes that even in some opinions where the court clearly treats the four items as requirements, the court therein at times refers to them as "factors." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 677 (N.D. Tex. 2016).

[13] When courts refer to this principle, usually it is in connection with a motion for a preliminary injunction rather than a motion for a TRO. But it has been stated in connection with a motion for a TRO, *e.g., Dates v. HSBC*, 721 F. Supp. 3d 616, 624 (S.D. Ohio 2024), and the Court believes that it applies to a motion for a TRO just as it applies to a motion for a preliminary injunction.

*1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at *1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich. May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for a TRO, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D.N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the TRO analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts in appropriate circumstances rely on hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

## ANALYSIS

As noted, a party seeking grant of a TRO (or a preliminary injunction) must show: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm in the absence of relief; (3) whether the balance of equities favors the movant; and (4) whether the injunction would serve the public interest. *Winter*, 555 U.S. at 20.

1. Likelihood of Success on the Merits

To obtain her requested TRO, Plaintiff must demonstrate that she is likely to succeed on the merits of her claims. *See Winter*, 555 U.S. at 20. As discussed below, the Court finds that at

this juncture, Plaintiff has failed to demonstrate a likelihood of success on the merits of any of her claims.

### a. Count I

Via Count I, Plaintiff is really challenging two types of conduct. The first is Defendant's purported failure to accommodate Plaintiff's disability, and the second is Defendant's dismissal of Plaintiff from the CRA Program. (Doc. No. 17 at 7). These challenges require different analyses, which the Court conducts below in turn.

#### i. *Failure to Accommodate*

To establish a failure to accommodate, a plaintiff must show that "(1) she was disabled within the meaning of the ADA, (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *Kirilenko-Ison v. Bd. of Educ. of Danville Ind. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020).[14] A plaintiff "bears the burden of requesting a reasonable accommodation and showing the accommodation is objectively reasonable." *Bolden v. Lowes Home Centers, LLC*, No. 3:17-CV-00741, 2018 WL 4181614, at *6 (M.D. Tenn. Aug. 31, 2018) (citing *Aldini v. Kroger Co. of*

---

[14] The standard laid out in *Kirilenko* is referred to as the "*prima facie* case for failure to accommodate." *Kirilenko*, 974 F.3d at 669. Thus, the Court notes here for context that because "ADA discrimination 'claims premised upon a[ ] failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination'; the familiar *McDonnell-Douglas* burden-shifting framework (applicable to claims premised on indirect evidence) therefore does not apply." *Brumley v. United Parcel Serv., Inc.*, 90 F.3d 834, 839 (6th Cir. 2018) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868-69). Rather, a slightly different framework applies. That is, if a plaintiff can make out the *prima facie* case for a failure to accommodate, then the burden shifts to the defendant "to prove that the proposed accommodation would impose an undue hardship." *Brownlow v. Alfa Vision Ins. Co.*, 527 F. Supp. 3d 951, 956 (M.D. Tenn. 2021). Here, as discussed below, Plaintiff has not yet made a showing of a *prima facie* case to establish a failure to accommodate (by failing to demonstrate that the requested accommodations were reasonable), such that the Court need not engage in the burden shifting framework applicable here.

It is worth highlighting that, consistent with the above discussion, although the concepts of "*prima facie* case" and burden-shifting are applicable to claims of failure to accommodate, they are not the more familiar *McDonnell Douglas* kind(s) of *prima facie* case and burden-shifting.

*Mich.*, 628 Fed. App'x 347, 350 (6th Cir. 2015); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007), *aff'd,* 783 F. App'x 589 (6th Cir. 2019)). "Courts should afford deference to professional academic judgments concerning reasonable accommodations." *Johnson v. Washington Cnty. Career Ctr.*, 470 Fed. App'x 433, 437 (6th Cir. 2012) (citing *Kaltenberger v. Ohio College of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998)). Moreover, the ADA does not require "an educational institution to lower or to effect substantial modifications of standards" when making accommodations. *Kaltenberger*, 162 F.3d at 436 (quoting *Se. Cmty. Coll. v. Davis,* 442 U.S. 397, 413 (1979)). Additionally, "the 'determination of what constitutes [a] reasonable [accommodation] is highly fact-specific, requiring case-by-case inquiry.'" *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (quoting *Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Commissioners*, 870 F.3d 471, 489 (6th Cir. 2017)).

At least at this stage, Plaintiff has not met her burden of showing that either of her requested accommodations—i.e., changes to the "expectations and deadlines set by [Plaintiff's] major advisor . . . in an attempt to mitigate [Plaintiff's] disabilities and allow [Plaintiff] to continue to make progress towards her research requirements in the CRA Program," (Doc. No. 19 at 2; Doc. No. 19-5), and assigning Plaintiff a new advisor—are objectively reasonable.

First, in the Memorandum, Plaintiff appears to argue that her requested accommodations related to the "expectations and deadlines set by [Plaintiff's] major advisor . . . in an attempt to mitigate [Plaintiff's] disabilities and allow [Plaintiff] to continue to make progress towards her research requirements in the CRA Program," (Doc. No. 19 at 2; Doc. No. 19-5),[15] were reasonable

---

[15] That is to say, the accommodations described in the letter from Terrell (Doc. No. 19-5), wherein Terrell, a psychotherapist for Plaintiff "clinically approv[ed]" Plaintiff's request for what Terrell characterizes as "reasonable accommodations," including: "flexibility in scheduling meetings and making up missed time including work and appointments, more emphasis on positive feedback during progress reviews, and increased communication amongst supervisory relationships." (*Id.*).

because Defendant has "provided other non-disabled students extensions to complete their thesis while remaining in good standing." (Doc. No. 19 at 8-9; Doc. No. 19-13 at 1). The record indicates that such extensions were granted for "medical or family reasons." (Doc. No. 19-13 at 1). But Defendant's history of providing extensions to other students based on medical or family reasons (the specifics of which the Court cannot ascertain from the current record) is not sufficient to show that the requested accommodation here is reasonable. As noted above, "the 'determination of what constitutes [a] reasonable [accommodation] is highly fact-specific, requiring case-by-case inquiry,'" *Bennett*, 86 F.4th at 326, such that even if certain deadline extensions previously had been afforded to certain students, that does not mean such deadline extensions are automatically or necessarily reasonable for *all students*, or for *Plaintiff* in particular.

The issue is whether extensions would have been reasonable in Plaintiff's particular case, which involved particular circumstances (regarding, for example, the nature, extent of, and cause(s) of delays in Plaintiff's progress) that may well have been absent in the other past cases

---

The Court does not believe at this juncture it can credit the conclusion of Terrell that the accommodations were *reasonable* (as opposed, of course, to medically necessary), because there is no indication that Terrell has any sort of knowledge of the requirements of the CRA Program, or the specifics of Plaintiff's academic record in particular. This does not mean, of course, that the Court denies that a medical practitioner's opinion is important to determining whether an accommodation is necessary. *See Horn v. Knight Facilities Mgmt.-GM, Inc.*, 556 F. App'x 452, 455 (6th Cir. 2014) (noting that "[i]n evaluating a reasonable accommodation claim 'this Court's analysis must focus on the limitations indicated by the doctors to determine whether [the plaintiff] was denied a necessary, reasonable accommodation.'" (quoting *Johnson v. Cleveland City Sch. Dist.*, 443 Fed. App'x. 974, 984 (6th Cir. 2011))). Indeed, the Court recognizes that "[i]n order for an accommodation to be reasonable, it should be necessary in light of the plaintiff's known physical limitations." *Belasco v. Warrensville Heights City Sch. Dist.*, 86 F. Supp. 3d 748, 764 (N.D. Ohio 2015). With that said, the Court also notes that even if an accommodation is medically necessary (which for the purposes of the present Motion, the Court accepts is true with respect to Plaintiff's requested accommodations), the accommodation may not necessarily be reasonable. *See Phillips v. Acacia on the Green Condo. Ass'n, Inc.*, No. 20-4182, 2022 WL 1692948, at *4 (6th Cir. May 26, 2022) (noting that even if an accommodation were necessary, it was not reasonable). This makes perfect sense because reasonableness naturally has to take account of the burden of the requested accommodation on the defendant—a matter about which doctors are unlikely to be at all concerned or knowledgeable.

that Plaintiff invokes. As evidenced by the Third Appeal Response, Plaintiff's delays with respect to her academic progress appear to be substantial and beyond mere delays in thesis progress. For example, in relevant part, the Third Appeal Response provides that:

> [Plaintiff] had not filed [her] empirical paper (in lieu of a master's thesis) by the end of [her] second year, a stated expectation for PhD students. Further, [ ] Oberoi did not recall seeing even a paragraph of written submission from [Plaintiff] over the entire course of [the] advising relationship, when it was expected [Plaintiff] would be working on [Plaintiff's] empirical paper and planned publications. Other expectations, listed in [Plaintiff's] Program of Studies document from April 2024, were not met. Specifically, [Plaintiff] failed to take Intro Qualitative Methods, Applied Qualitative Data Analysis, and Factor Analysis; and [Plaintiff] received a Permanent Incomplete for HOD-7960: Readings and Research in HOD.

(Doc. No. 1-4 at 2).

The current record does not indicate that Plaintiff's requested accommodations with respect to research and deadlines were reasonable. This is particularly true given that some of Plaintiff's requested accommodations are so vague (in that they comprise in part vague references to changed deadlines) that the Court is unable to determine whether those accommodations would "lower or [ ] effect substantial modifications of standards" at Vanderbilt. *Kaltenberger*, 162 F.3d at 436.

Plaintiff also argues that the requested accommodation related to her request for Vanderbilt to assign her a new advisor was reasonable because Defendant "routinely assigns advisors for new students, yet in Plaintiff's case, it has refused to do so, despite Plaintiff specifically requesting assignment of an advisor as a reasonable accommodation." (Doc. No. 19 at 9 n.9). Yet, at this juncture, the Court again cannot determine that this accommodation would have been reasonable for *Plaintiff*. Again, the Court refers to the Third Appeal Response, which, as noted above, indicates that the breakdown of Plaintiff's relationship with Oberoi was not Plaintiff's first issue with an advisor and that the student-advisor relationship is not conducive to a centralized

assignment process from Vanderbilt's administration. In relevant part, the Third Appeal Response provides (with "you" referring to Plaintiff):

> You have requested that the school assign a new advisor to you. It is not possible to assign you a new PhD advisor because of the nature of the advising relationship, which takes conversation and reflection by both parties involved to determine fit. Indeed, your own experience in twice choosing to discontinue working with your advisor is evidence of the importance of this relationship and the agency that is provided to both parties in assessing whether it continues to be productive. I am aware of the possibility that you may not find a willing advisor, given that you were unable to identify a new advisor in the months before you went on leave. If you cannot identify an advisor by December 5, 2025, then your PhD ambitions would be best fulfilled elsewhere with a fresh start, and you would be awarded a terminal master's degree on December 15, 2025. Note that there is no mention of dismissal in your transcript, as you will simply be moved to the master's track and graduated.

(Doc. No. 1-4 at 2-3).

For all of these reasons, the Court at this juncture cannot conclude that Plaintiff has met her burden of showing that the requested accommodations were reasonable such as to show a likelihood of success on the merits with respect to those portions of Count I predicated on Defendant's purported failure to accommodate.

### ii. Plaintiff's Dismissal from the CRA Program

"To establish [that] dismissal from an academic program constitutes a disability discrimination action under the ADA, a plaintiff must show that '(1) she is handicapped or disabled as defined in each statute, (2) she is 'otherwise qualified' to continue in the program, and (3) she was dismissed from the program on the basis of her handicap or disability.'" *Johnson*, 470 Fed. App'x at 436 (quoting *Kaltenberg*, 162 F.3d at 435). Here again, Plaintiff has failed to establish a likelihood of success on the merits.

The current record does not indicate that Plaintiff was dismissed from the CRA Program on the basis of her disability. Rather, the record indicates that Plaintiff failed to maintain compliance with several requirements of the CRA Program. For example, the Third Appeal

Response makes clear, as noted above, that Plaintiff was lagging behind on her academic progress. (Doc. No. 1-4 at 2). Seeming to anticipate this weakness in her claim, Plaintiff argues that any deficiency in Plaintiff's academic progress (referring specifically to Plaintiff's thesis progress) is due to Defendant's "failure to reasonably accommodate [Plaintiff's] disability." (Doc. No. 19 at 8). This argument collapses, however, in light of the Court's finding above that Plaintiff has not met her burden at this juncture to show that her requested accommodations were reasonable.

Accordingly, Plaintiff has failed, at least at this stage of the litigation, to show a likelihood of success on the merits with respect to those portions of Count I predicated on Plaintiff's dismissal from the CRA Program.

### b. Count II

With respect to Count II, Plaintiff has also failed to establish a likelihood of success on the merits. Via Count II, Plaintiff alleges that Defendant retaliated against Plaintiff for engaging in protected activity under the ADA.

To begin with, the Court cannot find that Plaintiff has demonstrated a likelihood of success on the merits of Count II because Plaintiff has failed to explain the actual legal framework for evaluating its failure-to-accommodate claim in Count II. In the Memorandum, Plaintiff merely references the *prima facie* standard (explained in further detail below) for establishing a retaliation claim under the ADA. Nowhere in the Memorandum does Plaintiff explain the burden shifting framework under *McDonnell-Douglas* that occurs if a plaintiff meets this *prima facie* standard or even explain explicitly that (or why) the burden-shifting framework under *McDonnell-Douglas* is applicable to Count II. This sort of cursory legal analysis does not cut the mustard, particularly where Plaintiff is seeking the extraordinary remedy of a TRO (and a preliminary injunction).

Alternatively, even if the Court were to overlook Plaintiff's shortcomings here and itself examine Count II within the *McDonnell-Douglas* framework, this still would not avail Plaintiff in showing a likelihood of success on the merits.

Where, as here,[16] a plaintiff does not seem to claim to have direct evidence of retaliation, the Court "analyzes [their] claim for ADA retaliation using the *McDonnell–Douglas* burden-shifting approach." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)). Under that framework, the plaintiff bears the initial burden of showing, as an indirect-evidence *prima facie* case, that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Rorrer*, 743 F.3d at 1046 (citing *Shelby Cnty. Bd. of Educ.*, 711 F.3d at 697. If a plaintiff can satisfy this burden, the burden then shifts to the defendant to show "some legitimate, nondiscriminatory reason" for the adverse action. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). Finally, should the defendant carry *this* burden, plaintiff then has the "opportunity to prove by a preponderance of evidence that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for discrimination." *Id.*

With respect to the fourth element of the indirect-evidence *prima facie* case for a retaliation claim, the causality element, the Sixth Circuit has held that where an adverse action "occurs very

---

[16] The Court understands that Plaintiff is not claiming to have direct evidence of discrimination for two reasons, first because Plaintiff has relied on the indirect-evidence *prima facie* standard for establishing ADA retaliation claims in her Memorandum (Doc. No. 17 at 9) (citing *A.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013)), and second because Plaintiff does not reference any direct evidence of discrimination in that portion of her Memorandum focused on the likelihood of success on the merits of Count II. The Court here forgoes any discussion of what does and does not constitute "direct evidence" of retaliatory motive because it is entirely clear that Plaintiff has not identified anything that could possibly be considered direct evidence.

close in time" after a defendant "learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a *prima facie* case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, the Sixth Circuit has noted that "where some time elapses" between the protected activity and the adverse action, temporal proximity must be coupled with "other evidence of retaliatory conduct to establish causality." *Id*. The Sixth Circuit has explained this doctrine by observing that when a defendant *immediately* takes an adverse action against an individual upon learning of a protected activity, that individual may be "unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the [adverse action]." *Id.* It is on this fourth element of establishing an indirect-evidence *prima facie* retaliation claim, the causality element, that Plaintiff's attempt to demonstrate a likelihood of success on the merits fails (alternatively to failing at the very outset for reasons discussed at the beginning of this section).

In attempting to demonstrate the requisite causality, Plaintiff focuses entirely on "temporal proximity" and asserts that Defendant's "course of conduct, following Plaintiff's request for accommodations and her appeal of the dismissal, supports a strong inference of retaliatory motive under Section 504 and the ADA." (Doc. No. 17 at 9-10). But, as explained below, this will not do, and this argument fails to establish the causality element of an indirect-evidence *prima facie* case of retaliation First, Plaintiff points to Defendant's removal of Oberoi as her advisor (as reflected in an internal Vanderbilt email dated May 28, 2025), (Doc. No. 17 at 9) (citing Doc. No. 19-21), and to Defendant dismissing Plaintiff from the CRA Program on July 24, 2025 as evidence of causality. Yet, neither this email, nor indeed Plaintiff's eventual dismissal from the CRA Program in July 2025, demonstrate the taking of an adverse action *immediately* following protected

activity so as to permit Plaintiff to rely on temporal proximity alone to establish causality. Rather, nearly four months had elapsed between Plaintiff's request for accommodations from the SAO, (Doc. No. 19-6), and the removal of Oberoi as Plaintiff's advisor, and half a year had elapsed between Plaintiff's first request for accommodations from the SAO and Plaintiff's dismissal from the CRA Program.[17]

Plaintiff also argues that Defendant's "refus[al]" to assign her a new advisor, which occurred on October 15, 2025, (Doc. No. 1-4 at 3), may be used to show causality, (Doc. No. 19 at 9-10), and that Defendant's failure to provide Plaintiff with her educational records, (Doc. No. 19 at 10), which Plaintiff requested on September 3, 2025, (Doc. No. 19-1 at ¶ 38), may be used to show causality. The Court disagrees. Both of these purported instances of adverse action occurred over half a year after Plaintiff's meeting with the SAO in February 2025, and at least a month after Plaintiff's first appeal of her dismissal, which occurred on July 29, 2025. (Doc. No. 19-14). Accordingly, the timeline of events detailed above does not evince an immediate adverse action that would "constitute evidence of a causal connection for the purposes of satisfying [an indirect-evidence] *prima facie* case of retaliation." *Mickey*, 516 F.3d at 525. Instead, because "some time [had] elapse[d]" between the protected activity (either in the form of the request for an accommodation or Plaintiff's first appeal of her dismissal) and the adverse actions cited by Plaintiff, Plaintiff must couple temporal proximity with "other evidence of retaliatory conduct to establish causality." *Id*. Plaintiff has not done so and accordingly has failed to satisfy the fourth

---

[17] The Court notes here that the removal of Oberoi as an advisor (in late May 2025 (Doc. No. 19-21)), and Plaintiff's dismissal (on July 24, 2025 (Doc. No. 19-12)), both occurred *before* Plaintiff's first appeal of her dismissal, which occurred on July 29, 2025, when Plaintiff emailed Allen requesting to appeal her dismissal for the first time. (Doc. No. 19-14).

element of an indirect-evidence *prima facie* case of retaliation, meaning that the Court cannot find that Plaintiff has demonstrated a likelihood of success on the merits of Count II.[18]

### c. Count III

Plaintiff also has failed to demonstrate a likelihood of success on the merits of Count III, her breach of contract claim. In the Memorandum, Plaintiff argues that Defendant "has already acknowledged [in the Third Appeal Response] that it failed to follow its own probation and dismissal procedures. This admission strongly supports Plaintiff's likelihood of success on the breach of contract claim as the student handbook and related policies form part of the contractual relationship between Vanderbilt and its students." (Doc. No. 17 at 10; Doc. No. 1-4 at 2). Plaintiff further argues that "[i]nstead of providing Plaintiff notice of her 'lack of progress' and then placing her on probation with an improvement plan as Vanderbilt's Student Handbook and related documents require, Vanderbilt proceeded directly to dismissal and then conditioned continued enrollment on her unilateral ability to obtain an advisor, contrary to its own established practices." (Doc. No. 19 at 10-11). Even assuming *arguendo* that the "student handbook and related policies form" a contract between Plaintiff and Defendant,[19] and that Defendant somehow breached this contract, this is not the end of a breach of contract analysis.

It is well-settled law that "[o]nce a party has materially breached a contract, the other party's obligations are excused." *See e.g., Gizzi v. Marinov*, 79 F.3d 1148 (6th Cir. 1996). "A

---

[18] Plaintiff also references a single comment, located in a screenshot that Plaintiff took during a Microsoft Teams meeting with Vanderbilt staff, where Vanderbilt staff refer to the "musings of [Plaintiff's] therapist." (Doc. No. 19-20). The Court, without more, cannot see how this comment could support an argument that any of the alleged adverse actions were taken in retaliation for Plaintiff's protected activity.

[19] What the Court here assumes *arguendo* might well actually be valid. *See, e.g., Evans v. Vanderbilt Univ. Sch. of Med.*, 589 F. Supp. 3d 870, 892–93 (M.D. Tenn. 2022) (Richardson, J.) (noting, inter alia, that catalogs, manuals, student handbooks, bulletins, circulars and regulations of a university help define an implied contractual relationship between a student and the university).

breach is 'material' if a party fails to perform a substantial part of the contract or one or more of its essential terms or conditions, the breach substantially defeats the contract's purpose, or the breach is such that upon a reasonable interpretation of the contract, the parties considered the breach as vital to the existence of the contract."[20] *Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. LLC*, 777 F. App'x 785, 791 (6th Cir. 2019). As detailed above, the Third Appeal Response asserted that Plaintiff's dismissal was warranted due to Plaintiff's lack of a thesis advisor and Plaintiff's failure to make "satisfactory academic progress toward [Plaintiff's] degree," including her failure to meet expectations listed in Plaintiff's "Program of Studies document." (Doc. No. 1-4 at 1-2). At least at this juncture then, it seems not unlikely that these (purported) failures by Plaintiff to meet academic expectations constitute a material breach of whatever contractual relationship existed between Plaintiff and Defendant. It seems particularly probable to the Court that failing to meet certain academic benchmarks could likely be understood as a failure to perform by Plaintiff of the "essential terms" of Defendant and Plaintiff's contractual relationship. *Spec's*, 777 F. App'x at 791. *Cf. Merrow v. Goldberg*, 672 F. Supp. 766, 774 (D. Vt. 1987) (finding that because "plaintiff [(a student)] breached the contract [between the student and a state college] by failing to perform academically according to the college's, or any reasonable, standards . . . defendants [officers at a state university] are relieved of any obligation under the contract.") If such failure by Plaintiff to meet certain academic expectations does constitute a material breach, then Defendant's obligations to continue performing (to the extent there are contractual obligations at all), are, of course, excused. *Gizzi*, 79 F.3d 1148.

Thus, because of the uncertainty extant in the record as to whether Plaintiff breached he contractual relationship between Plaintiff and Defendant on which Plaintiff relies, and whether

---

[20] The Court is aware that this test is framed in very subjective terms—like "substantial," "essential," and "reasonable," the application of which in a particular case may be viewed differently by different persons.

such breach was material such as to excuse any further obligation of performance by Defendant, the Court cannot at this juncture conclude that Plaintiff has demonstrated a likelihood of success as to Count III.

Because Plaintiff has failed to demonstrate a likelihood of success as to any of her claims as required, Plaintiff's requested injunctive relief (whether in the form of a TRO or a preliminary injunction) will be denied.

2. <u>Plaintiff's Requested Hearing and Briefing Schedule</u>

As noted above, via the Motion Plaintiff also requests that the Court set a briefing schedule for the Motion and set a hearing date as necessary to consider the Motion. (Doc. No. 18-1 at ¶¶ 6, 7). As also noted above, Plaintiff here apparently is referring to a briefing schedule on Plaintiff's request for a preliminary injunction, into which Plaintiff's requested TRO would be converted so that Plaintiff's requested injunctive relief would "remain in effect during the pendency of this action." (Doc. No. 19 at 15). As noted in a footnote above, the Court for administrative and logistical reasons is treating both requests in the Motion (the one for a TRO and the one for a preliminary injunction) as denied at this time (without prejudice to Plaintiff's prerogative to move in the future for a preliminary injunction based on additional evidence beyond that presented in connection with the instant Motion). So, the Court will also deny as moot Plaintiff's request for a briefing schedule and hearing on the Motion.

CONCLUSION

For the reason's described herein, Plaintiff's Motion (Doc. No. 18) will be **DENIED** in its entirety. An appropriate accompanying order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE